**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| CINDY WALLACE, Individually and On Behalf of All Others Similarly Situated, | Civil Action No._____ |
| Plaintiff, | **JURY TRIAL DEMANDED** |
| v. | |
| AT&T, INC. and AT&T MOBILITY LLC, | |
| Defendants. | |

## CLASS ACTION COMPLAINT

Plaintiff Cindy Wallace ("Plaintiff"), individually and on behalf of the Class defined herein of similarly situated persons ("Class Members"), alleges the following against Defendants AT&T, Inc. and AT&T Mobility LLC (collectively, "AT&T" or "Defendants"), based on personal knowledge with respect to herself and on information and belief as to all other matters:

## SUMMARY OF THE CASE

1.      On July 12, 2024, AT&T announced that records of calls and texts of "nearly all" its wireless customers and customers of mobile virtual network operators ("MVNO") had been illegally downloaded from its workspace on a third-party cloud platform between April 14 and April 25, 2024, in a massive security breach ("Data Breach").[1]

2.      The stolen data contains phone numbers of both cellular and landline customers of

---

[1] Jasper Hamill, *Is Snowflake the 'third-party cloud platform' caught up in massive AT&T data heist?*, THE STACK (July 12, 2024), available at: https://www.thestack.technology/at-t-data-breach-snowflake/ (last visited September 5, 2024).

around 110 million AT&T customers, as well as AT&T records of calls and text messages—such as who contacted who by phone or text—during a six-month period between May 1, 2022, and October 31, 2022. Some of the stolen data also includes customer records from January 2, 2023.[2]

3. According to AT&T the stolen data "does not contain the content of calls or texts," but does include calling and texting records that an AT&T phone number interacted with during the six-month period, as well as the total count of a customer's calls and texts, and call durations. Some of the stolen records include cell site identification numbers associated with phone calls and text messages, information that can be used to determine the approximate location of where a call was made or text message sent.

4. The nature of the compromised information is uniquely sensitive. For example, as noted by CNN, cybercriminals can now identify relationships among phone numbers, a useful data point for hackers to make scams more believable. As just one example, hackers can now see what banks customers are in regular contact with and send a more effective phishing attempt posing as that bank or as some other regular contact of the impacted customers.[3]

5. Wired also wrote about the "sweeping danger" of this breach, speaking with a cybersecurity expert who noted the data compromised is a "gold mine." This is especially so for attackers "looking to construct compelling phishing attacks and other scams to target individuals" or even "specific communities of people." Even without contents of communications, the

---

[2] *Id.*

[3] Ramishah Maruf, *How AT&T customers can protect themselves in the latest data breach*, CNN (July 12, 2024), available at: https://www.cnn.com/2024/07/12/business/att-customers-data-breach-protection/index.html (last visited September 5, 2024).

compromised metadata has "major implications for people's privacy and security."[4]

6. Another security expert highlighted that the potential for triangulation of customers' locations from compromised cell site identification numbers "adds a physical dimension to the already extensive privacy violation and could expose individuals to highly targeted and convincing social engineering attacks, not to mention compromising [their] physical security. . . ."[5]

7. Bloomberg reported that AT&T's third-party cloud platform involved in the Data Breach was hosted by Snowflake, a leading cloud-based data storage and analytics provider that allows companies to store and use huge datasets on its servers. Snowflake also offers its customers the option of encrypting the data stored on its servers. Despite this optionality, AT&T did not encrypt or otherwise implement available security precautions for the data it chose to store on Snowflake's servers. It is believed that the threat actors in this breach did not access the data through Snowflake. Rather, the breach occurred at AT&T.

8. In June 2024, Snowflake announced a security incident affecting up to 165 of its customers. Mandiant, a Google-owned cybersecurity firm that assisted Snowflake in its incident response efforts, tracked the unidentified threat actor under the name UNC5537, describing it as a financially motivated threat actor.

9. Mandiant explained that since April 2024 "UNC5537 [] [was] systematically compromising Snowflake customer instances using stolen customer credentials, advertising victim

---

[4] Lily Hay Newman, *The Sweeping Danger of the AT&T Phone Records Breach*, WIRED (July 12, 2024), available at: https://www.wired.com/story/att-phone-records-breach-110-million/ (last visited September 5, 2024).

[5] Nate Nelson, *AT&T Breach May Also Impact Millions of Boost, Cricket, H2O Customers*, DARK READING (July 12, 2024), available at: https://www.darkreading.com/cyberattacks-data-breaches/att-breach-may-also-impact-millions-of-boost-cricket-h2o-customers (last visited September 5, 2024).

data for sale on cybercrime forums, and attempting to extort many of the victims."

10.     Mandiant's investigation revealed that the threat campaign was successful because "the impacted accounts were not configured with multi-factor authentication enabled, meaning successful authentication only required a valid username and password."[6] In other words, had AT&T enabled multi-factor authentication ("MFA") this Data Breach would likely have been prevented.

11.     Plaintiff brings this class action against Defendants for their failure to properly secure and safeguard Plaintiff's and Class Members' private information ("Private Information"), including, but not limited to, phone call and text message records for "nearly all" of AT&T's 110 million cellular customers, as well as information about the location of cellular communications towers closest to an unspecified subset of subscribers.

12.     The Private Information is and was intrinsically valuable both to Defendants, who stored it as part of their services for customers, and to the individuals to whom the Private Information belonged. Private Information, or personally identifiable information ("PII"), has considerable value and constitutes an enticing and well-known target to hackers. Hackers easily can sell stolen data as there has been a "proliferation of open and anonymous cybercrime forums on the Dark Web that serve as a bustling marketplace for such commerce."[7] It's compromise erodes its intrinsic value and exposes Class Members to a host of injuries.

13.     The Data Breach resulted from Defendants' failure to implement adequate and

---

[6] Threat Intelligence, *UNC5537 Targets Snowflake Customer Instances for Data Theft and Extortion*, GOOGLE CLOUD (June 10, 2024), available at: https://cloud.google.com/blog/topics/threat-intelligence/unc5537-snowflake-data-theft-extortion (last visited September 5, 2024).

[7] Brian Krebs, *The Value of a Hacked Company*, Krebs on Security (July 14, 2016), http://krebsonsecurity.com/2016/07/the-value-of-a-hacked-company/ (last accessed September, 5, 2024).

reasonable cybersecurity procedures and protocols necessary to protect the Private Information exfiltrated. Among other failures, AT&T failed to implement MFA on its Snowflake account to protect their customers' data, even though this safeguard was available and easily implemented.

14. Defendants had a duty to adequately safeguard this Private Information under the law, as well as under industry standards and duties imposed by statutes, including Section 5 of the Federal Trade Commission Act (the "FTC Act").

15. Defendants breached their duties and disregarded the rights of Plaintiff and Class Members by intentionally, willfully, recklessly, or negligently failing to implement proper and reasonable measures to safeguard individuals' (whose information they needed to protect) Private Information; failing to take available and necessary steps to prevent unauthorized disclosure of data; and failing to follow proper protocols, policies, and procedures regarding MFA, among others.

16. As a result of Defendants' inadequate security and breach of their duties and obligations, the Private Information of Plaintiff and Class Members was compromised through disclosure to an unauthorized criminal third party. Plaintiff and Class Members have suffered injuries as a direct and proximate result of Defendants' conduct. These injuries include: (i) benefit of the bargain; (ii) diminution in value and/or lost value of Private Information, a form of property that Defendants obtained from Plaintiff and Class Members and for which there is a well-established national and international market; (iii) out-of-pocket expenses associated with preventing, detecting, and remediating identity theft, social engineering, and other unauthorized use of their Private Information; (iv) opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach, including, but not limited to, lost time; (v) the continued, long term, and certain increased risk that unauthorized persons will access and abuse Plaintiff's

and Class Members' Private Information; (vi) the continued and certain increased risk that the Private Information that remains in Defendants' possession is subject to further unauthorized disclosure for so long as Defendants fail to undertake proper measures to protect the Private Information; (vii) invasion of privacy and increased risk of fraud and identity theft; and (viii) theft of their Private Information and the resulting loss of privacy rights in that information. This action seeks to remedy these failings and their consequences. Plaintiff and Class Members have a continuing interest in ensuring their Private Information is and remains safe and are entitled to injunctive and other equitable relief.

17. Accordingly, Plaintiff, on behalf of herself and the millions of similarly situated victims of the Data Breach, seeks to hold Defendants responsible for the injuries suffered as the result of their misconduct and failure to act, and demands appropriate monetary, equitable, injunctive, and declaratory relief.

## JURISDICTION AND VENUE

18. This Court has subject matter jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2) because this is a class action where the amount in controversy exceeds the sum or value of $5 million, exclusive of interest and costs, there are more than 100 putative members in the proposed class, and at least one Class Member is a citizen of a state different from Defendants. The Court also has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367 because all claims alleged are part of the same case or controversy.

19. This Court has personal jurisdiction over Defendants because Defendants are headquartered and routinely conduct business in the state of Texas. Defendants have sufficient minimum contacts in this State, has intentionally availed itself of this jurisdiction by conducting

business in this State, including through marketing and/or selling products and/or services and/or by accepting and processing payments for those products and/or services within this State.

20.     Venue is proper in this Court under 28 U.S.C. § 1391 because many of the events that gave rise to Plaintiff's claims took place within this District, and Defendants do business in this District.

## **PARTIES**

21.     Plaintiff Cindy Wallace is a citizen and resident of Palestine, Illinois. Plaintiff has been an AT&T wireless customer for approximately 20 years, and specifically during May to October 2022 and January 2023.

22.     Defendant AT&T, Inc. is a Delaware corporation with its principal place of business in Dallas, Texas. AT&T, Inc. is an American multinational telecommunications holding company. It is the world's third-largest telecommunications company by revenue and the second-largest wireless carrier in the United States.[8] As of 2023, AT&T was ranked 13th on the Fortune 500 rankings of the largest United States corporations, with revenues of $122.4 billion.[9]

23.     Defendant AT&T Mobility LLC is a Delaware limited liability company with its principal place of business in Atlanta, Georgia. AT&T Mobility, LLC, also known as AT&T Wireless and marketed as AT&T, is an American telecommunications company. It is a wholly owned subsidiary of AT&T, Inc. and provides wireless services in the United States. AT&T Mobility is the second largest wireless carrier in the United States, with 114.5 million subscribers

---

[8] 1Q2024 Earnings, *Financial and Operational Trends*, AT&T (April 24, 2024), available at: https://investors.att.com/~/media/Files/A/ATT-IR-V2/financial-reports/quarterly-earnings/2024/1Q24/T_1Q24_Trending_Schedule.pdf (last visited September 5, 2024).

[9] https://www.marketwatch.com/investing/stock/t/financials (last visited September 5, 2024).

as of March 31, 2024.[10]

## FACTUAL ALLEGATIONS

**A.      AT&T Discloses Its Second Major Breach of Customer Data This Year**

25.      On July 12, 2024, AT&T publicly announced that data of "nearly all" its 110 million cellular customers from May 1, 2022 to October 31, 2022 and January 2, 2023 was illegally downloaded from its workspace on a third-party [Snowflake's] cloud platform.[11]

26.      According to AT&T the stolen data includes calling and texting records that an AT&T phone number interacted with during the six-month period, as well as the total count of a customer's calls and texts, and call durations — information that is known as metadata. It also includes other phone numbers that an AT&T wireless number interacted with during this time, including AT&T landline customers.[12]

27.      AT&T states "[t]he downloaded data doesn't include the content of any calls or texts. It doesn't have the time stamps for the calls or texts. It also doesn't have any details such as Social Security numbers, dates of birth, or other personally identifiable information. [¶] While the data doesn't include customer names, there are often ways to find a name associated with a phone number using publicly available online tools."[13]

28.      The Data Breach also includes a subset of records from January 2, 2023. For this subset of records, one or more cell site ID numbers associated with the phone calls and text

---

[10] 1Q2024 Earnings, *Financial and Operational Trends*, AT&T (April 24, 2024), available at: https://investors.att.com/~/media/Files/A/ATT-IR-V2/financial-reports/quarterly-earnings/2024/1Q24/T_1Q24_Trending_Schedule.pdf (last visited September 5, 2024).

[11]   https://www.att.com/support/article/my-account/000102979?source=EPcc000000000000U (last visited September 5, 2024).

[12] *Id*.

[13] *Id*.

messages were also breached.[14] This is information that can be used to determine the approximate location of where a call was made or text message was sent.

29.     The stolen data also includes call records of customers with phone service from other cell carriers that rely on AT&T's network - mobile virtual network operators or MVNOs. According to public sources, those MVNOs likely include wireless service providers such as Boost Mobile, Cricket Wireless, H2O, and Straight Talk Wireless.[15]

30.     On July 12, 2024, AT&T began notifying Plaintiff and Class Members of the Data Breach via electronic mail ("Email Notice").



---

[14] *Id*.

[15] https://www.whistleout.com/CellPhones/Guides/att-mvnos (last visited September 5, 2024).

31.     In a July 12, 2024 SEC filing AT&T provided even more details of the Data Breach.

In its Form-8K disclosing a material cybersecurity incident AT&T explained:

> On April 19, 2024, AT&T Inc. ("AT&T") learned that a threat actor claimed to have unlawfully accessed and copied AT&T call logs. [] Based on its investigation, AT&T believes that threat actors unlawfully accessed an AT&T workspace on a third-party cloud platform and, between April 14 and April 25, 2024, exfiltrated files containing AT&T records of customer call and text interactions that occurred between approximately May 1 and October 31, 2022, as well as on January 2, 2023, as described below . . .
>
> . . .   . . .   . . .
>
> Current analysis indicates that the data includes, for these periods of time, records of calls and texts of nearly all of AT&T's wireless customers and customers of mobile virtual network operators ("MVNO") using AT&T's wireless network. These records identify the telephone numbers with which an AT&T or MVNO wireless number interacted during these periods, including telephone numbers of AT&T wireline customers and customers of other carriers, counts of those interactions, and aggregate call duration for a day or month. For a subset of records, one or more cell site identification number(s) are also included. While the data does not include customer names, there are often ways, using publicly available online tools, to find the name associated with a specific telephone number.
>
> . . .   . . .   . . .
>
> On May 9, 2024, and again on June 5, 2024, the U.S. Department of Justice determined that, under Item 1.05(c) of Form 8-K, a delay in providing public disclosure was warranted. AT&T is now timely filing this report. AT&T is working with law enforcement in its efforts to arrest those involved in the incident. Based on information available to AT&T, it understands that at least one person has been apprehended. As of the date of this filing, AT&T does not believe that the data is publicly available.[16]

32.     On July 12, 2024, AT&T confirmed the access point had been secured, it did not

---

[16] https://otp.tools.investis.com/clients/us/atnt2/sec-show.aspx?FilingId=17677638&Cik=0000732717&Type=PDF&hasPdf=1 (last visited September 5, 2024).

believe the data was publicly available, and at least one person had been apprehended.[17]

33.     404 Media reported that John Binns, a 24-year-old U.S. citizen who was previously arrested in Turkey in May 2024, is connected to the security events. He was also previously indicted in the U.S. for infiltrating T-Mobile in 2021 and selling its customer data.[18]

34.     This is the second breach of AT&T customer data this year. Earlier this year data of over 70 million AT&T customers — including encrypted passcodes for accessing AT&T customer accounts — was published on a cybercrime forum. AT&T confirmed the data was authentic but does not know whether the data originated from AT&T or one of its vendors.[19] The breached data includes names, phone numbers, postal addresses, and Social Security numbers.[20] Based on AT&T's preliminary analysis, the data appears to be from 2019 or earlier, impacting approximately 7.6 million current AT&T account holders and approximately 65.4 million former account holders. AT&T claims there is no evidence this was the result of unauthorized access to its systems.[21]

**B.     AT&T's Breached Data Was Hosted on Snowflake's Data Cloud**

35.     An AT&T spokesperson confirmed that the data was exposed "on 'AI data cloud' provider Snowflake[.]"

36.     Snowflake provides digital warehouses, known as "Snowflake Data Clouds" for its

---

[17]  https://www.att.com/support/article/my-account/000102979 (last visited September 5, 2024).

[18]  https://www.404media.co/american-hacker-in-turkey-linked-to-massive-at-t-breach/ (last visited September 5, 2024).

[19]     https://www.darkreading.com/remote-workforce/att-confirms-73m-customers-affected-data-leak; https://about.att.com/story/2024/addressing-data-set-released-on-dark-web.html (last visited September 5, 2024).

[20]  *Id*.

[21]  *Id*.

clients, such as AT&T, and as a result has access to, stores, and maintains huge datasets of Private Information of AT&T's corporate clients' customers and employees.

37.     In or around mid-April 2024, an unauthorized party or parties gained access to Snowflake's customer accounts stealing customer and employee data from AT&T and others.

38.     Google-owned cybersecurity incident response firm, Mandiant, which Snowflake retained to help it investigate the incident, attributed the breach to an as-yet-uncategorized cybercriminal group tracked as UNC5537. Mandiant's researchers say the hackers are financially motivated and have members in North America and at least one member in Turkey.  Data of some of Snowflake's corporate customers has been published on known cybercrime forums.[22]

**C.      Mandiant Confirms That Failure to Implement Multi-Factor Authentication Was a Significant Factor in the Data Breach**

39.     Mandiant revealed that the threat campaign was successful because "the impacted accounts were not configured with multi-factor authentication enabled, meaning successful authentication only required a valid username and password."[23]

40.     MFA is a simple yet robust security system that requires more than one method of authentication from independent categories of credentials (*e.g.*, a username/password and confirmation link sent via email).

41.     Infamous threat actors, known by the handle "ShinyHunters," boasted to journalists that the Data Breach was enabled by the lack of MFA enforcement.[24]

42.     MFA administrator enforcement is the industry standard, according to Ofer Maor,

---

[22]     https://cloud.google.com/blog/topics/threat-intelligence/unc5537-snowflake-data-theft-extortion (last visited September 5, 2024)

[23]     *Id*.

[24]     https://www.wired.com/story/epam-snowflake-ticketmaster-breach-shinyhunters/     (last visited September 5, 2024).

cofounder and Chief Technology Officer of data security investigation firm Mitiga.[25] He notes that "most SaaS (soft-as-a-service) vendors, once deployed as an enterprise solution, allow administrators to enforce MFA… they require every user to enroll in MFA when they first login and make it no longer possible for users to work without it." A data security firm's principal simply noted it is "surprising that the built-in account management within Snowflake doesn't have more robust capabilities like the ability to enforce MFA." [26]

43.     Snowflake blames the data thefts on its customers – such as AT&T here, who did not require MFA to secure their Snowflake accounts. Indeed, AT&T's failure to implement the most basic cybersecurity feature (*i.e.*, MFA) was the cause of this Data Breach.

44.     AT&T, as a telecommunications provider, knows that certain basic security measures are critical to protecting sensitive information and that these include implementing MFA requirements. According to AT&T, "[t]he majority of data breaches are caused by brute force attacks on credentials."[27] AT&T even has its own MFA application, AT&T MFA, which it describes as "AT&T's secure multi-factor authenticator that significantly improves both business and personal account login security."[28]

45.     Yet AT&T did not take any measures to ensure that the sensitive information located on Snowflake's cloud was fully protected. Had AT&T implemented a policy to enable MFA, the MFA features may have prevented this Data Breach.

---

[25]     https://www.itpro.com/security/cyber-attacks/with-hundreds-of-snowflake-credentials-published-on-the-dark-web-its-time-for-enterprises-to-get-mfa-in-order (last visited September 5, 2024).

[26]     https://www.informationweek.com/cyber-resilience/snowflake-s-lack-of-mfa-control-leaves-companies-vulnerable-experts-say (last visited September 5, 2024).

[27] https://cdn-cybersecurity.att.com/docs/product-briefs/att-multi-factor-authenticator.pdf (last visited September 5, 2024).

[28] https://apps.apple.com/us/app/at-t-mfa/id6444501887 (last visited September 5, 2024).

**D.    Defendants Promised to Safeguard Customers' Private Information**

46.    AT&T collects a vast amount of data from its customers. AT&T's Privacy Notice

identifies the data it collects as including:

> **Account information**. You give us information about yourself,
> such as contact and billing information. We also keep service-
> related history and details, including Customer Proprietary Network
> Information (https://www.att.com/consent/cpni/)[29]
>
> **Equipment information**. We collect information about equipment
> on our network like the type of device you use, device ID, and phone
> number.
>
> **Network performance**. We monitor and test the health and
> performance of our network. This includes your use of Products and
> Services to show how our network and your device are working.
>
> **Location information**. Location data is automatically generated
> when devices, products and services interact with cell towers and
> Wi-Fi routers. Location can also be generated by Bluetooth services,
> network devices and other tech, including GPS satellites.
>
> **Web browsing and app information**. We automatically collect a
> variety of information which may include time spent on websites or
> apps, website and IP addresses and advertising IDs. It also can
> include links and ads seen, videos watched, search terms entered and
> items placed in online AT&T shopping carts. We may use pixels,
> cookies and similar tools to collect this information. We don't
> decrypt information from secure websites or apps – such as
> passwords or banking information.
>
> **Biometric information**. Fingerprints, voice prints and face scans
> are examples of biological characteristics that may be used to
> identify individuals. Learn more in our Biometric Information
> Privacy Notice (/privacy/privacy-notice/biometrics.html)
>
> **Third-party information**. We get information from outside
> sources like credit reports, marketing mailing lists and commercially

---

[29] AT&T explains: "We use Customer Proprietary Network Information (CPNI) to offer new types of products and services we think you'd like from AT&T and our affiliates. CPNI is information about your telecommunications and VoIP (internet phone) services from us, including what plans you subscribe to, how you use these services and details such as who you have called." https://www.att.com/consent/cpni/ (last visited September 5, 2024).

available demographic and geographic data. Social media posts also may be collected, if you reach out to us directly or mention AT&T.[30]

47. According to AT&T "All these types of information are considered Private Information when they can reasonably be linked to you as an identifiable person or household. For instance, information is personal when it can be linked to your name, account number or device."[31]

48. AT&T promises to provide confidentiality and adequate security for the data it collects from customers, including Plaintiff and Class Members, through its applicable privacy policy and through other disclosures in compliance with statutory privacy requirements. AT&T's Privacy Notice provides:

**Data retention and security**

We keep your information as long as we need it for business, tax or legal purposes. We set our retention periods based on things like what type of personal information it is, how long it's needed to operate the business or provide our products and services, and whether it's subject to contractual or legal obligations. These obligations might be ongoing litigation, mandatory data retention laws or government orders to preserve data for an investigation. After that, we destroy it by making it unreadable or indecipherable.

We work hard to safeguard your information using technology controls and organizational controls. We protect our computer storage and network equipment. We require employees to authenticate themselves to access sensitive data. We limit access to personal information to the people who need access for their jobs. And we require callers and online users to authenticate themselves before we provide account information.

No security measures are perfect. We can't guarantee that your information will never be disclosed in a manner inconsistent with this notice. If a breach occurs, we'll notify you as required by law.[32]

---

[30] https://about.att.com/privacy/privacy-notice.html (last visited September 5, 2024).

[31] *Id.*

[32] *Id.*

15

49.     AT&T's Privacy Policy further states that while it shares customers' Private Information with certain third parties AT&T requires those parties to protect that information consistent with its Privacy Policy:

**How we share your information**

As described in the following paragraphs, AT&T shares information within our own AT&T companies and affiliates. We also share with non-AT&T companies.

\*\*\*     \*\*\*     \*\*\*

**Non-AT&T companies providing a service**.

We use suppliers for services like marketing and mailing bills. When we share your information with suppliers, we require them to use it only for the intended purpose and to protect it consistent with this notice.

**Non-AT&T companies or entities where authorized or required by law. [¶]** This can happen when we:

● Comply with court orders, subpoenas, and lawful discovery requests, and as otherwise authorized or required by law. Like all companies, we must comply with legal requirements. You can learn more in our Transparency Report (/privacy/transparencyreport.html).

● Detect and prevent fraud.

● Provide or obtain information related to payment for your service.

● Route your calls or other communications, like connecting calls or text messages with other carrier networks.

● Ensure network operations and security, defend against legal claims and enforce our legal rights.

● Notify, respond, or provide information (including location) to an appropriate governmental entity in emergency circumstances such as immediate danger of death or serious physical injury.

● Alert the National Center for Missing and Exploited Children to information concerning child pornography if we become aware

through the provision of our services.

● Share the names, addresses and telephone numbers of non-mobile phone customers with phone directory publishers and directory assistance services as required by law. We honor your request for non-published or non-listed numbers.

● Provide name and phone number for wireline and wireless Caller ID and related services like Call Trace.[33]

50.     Additionally, AT&T's July 12, 2024 notice of "Unlawful access of customer data" posted on its website promises: "We hold ourselves to a high standard and commit to delivering the experience that you deserve. We constantly evaluate and enhance our security to address changing cybersecurity threats and work to create a secure environment for you. We invest in our network's security using a broad array of resources including people, capital, and innovative technology advancements."[34]

51.     AT&T assumed a duty to Plaintiff and Class Members to implement and maintain reasonable and adequate security measures to secure, protect, and safeguard Plaintiff's and Class Members' Private Information against unauthorized access and disclosure. AT&T knew that the large data files stored on Snowflake's servers contained sensitive information of millions of its customers.

52.     AT&T's responsibility was to protect the Private Information of Plaintiff and Class Members by implementing and ensuring its third-party service providers implemented sufficient security measures to protect Plaintiff and Class Members' Private Information, including, but not limited to, MFA.

53.     AT&T breached its duties and disregarded the rights of Plaintiff and the Class

---

[33] *Id.*

[34] https://www.att.com/support/article/my account/000102979?source=EPcc000000000000U (last visited September 5, 2024)

Members by intentionally, willfully, recklessly, or negligently, *inter alia*, failing to implement proper and reasonable measures to safeguard individuals' (whose information it was required to protect) Private Information; failing to take available and necessary steps to prevent unauthorized disclosure of data; and failing to follow minimum industry standards and protocols, including implementing MFA on its Snowflake Data Cloud account.

54. Plaintiff and other customers paid AT&T for its services. At least a partial payment for AT&T's services was attributed to protecting Plaintiff's and Class Members' information in AT&T's possession, including the information released to criminals here.

55. As a result of Defendants' inadequate security and breach of their duties and obligations, the Private Information of Plaintiff and Class Members was compromised through disclosure to an unauthorized criminal third party. Plaintiff and Class Members have suffered injuries as a direct and proximate result of Defendants' conduct.

**E.    Private Information Is a Valuable Property Right**

56. Private Information, particularly PII is a valuable property right.[35] In a Federal Trade Commission roundtable presentation, former Commissioner, Pamela Jones Harbour, underscored this point by observing:

> Most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable. Data is currency. The larger the data set, the greater potential for analysis – and profit.[36]

---

[35] https://www.researchgate.net/publication/283668023 (last visited September 5, 2024).

[36]    https://www.ftc.gov/public-statements/2009/12/remarks-ftc-exploring-privacy-roundtable (last visited September 5, 2024).

57.     The value of PII as a commodity is measurable.[37] "PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets."[38]

58.     "Firms are now able to attain significant market valuations by employing business models predicated on the successful use of personal data within the existing legal and regulatory frameworks."[39] It is estimated that American companies have spent over $19 billion on acquiring personal data of consumers in 2018.[40] It is so valuable to identity thieves that once PII has been disclosed, criminals often trade it on the "cyber black-market" or the "dark web" for many years.

59.     As a result of its real value identity thieves and cyber criminals often ransom stolen data demanding companies pay large sums of money under the threat of public disclosure or its being put up for sale on the Dark Web. Indeed, the criminals who compromised Snowflake's corporate accounts in the Data Breach here are seeking millions of dollars in exchange for the stolen information.

60.     Further, consumers place a high value on the privacy of their data. Researchers shed light on how many consumers value their data privacy—and the amount is considerable. Indeed, studies confirm that "when privacy information is made more salient and accessible, some consumers are willing to pay a premium to purchase from privacy protective websites."[41] Here,

---

[37] http://www.medscape.com/viewarticle/824192 (last visited September 5, 2024).

[38] *See* John T. Soma *et al.*, *Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets*, 15 RICH. J.L. & TECH. 11, at *3-4 (2009) (citations omitted).

[39]     https://www.oecd-ilibrary.org/science-and-technology/exploring-the-economics-of-personal-data_5k486qtxldmq-en (last visited September 5, 2024).

[40] https://www.iab.com/news/2018-state-of-data-report/ (last visited September 5, 2024).

[41] https://www.jstor.org/stable/23015560 (last visited September 5, 2024).

Plaintiff and Class Members paid a price premium to AT&T dedicated to securing and protecting their data.

61.     Given these facts, any company that transacts business with a consumer and then compromises the privacy of consumers' Private Information has thus deprived that consumer of the full monetary value of the consumer's transaction with the company.

## F.     Defendants Knew or Should Have Known They Were High Risk Targets For Data Thieves

62.     Cyberattacks have become so notorious that the FBI and U.S. Secret Service have issued a warning to potential targets, so they are aware of, and prepared for, a potential attack.[42] The FBI, FTC, GAO, U.S. Secret Service, United States Cybersecurity and Infrastructure Security Agency ("CISA"), State Attorney General Offices and many other government and law enforcement agencies, and hundreds of private cybersecurity and threat intelligence firms, have issued warnings that put Defendants on notice, long before the Data Breach, that (1) cybercriminals are targeting large, public companies such as Snowflake and AT&T; (2) cybercriminals are ferociously aggressive in their pursuit of large collections of Private Information like that in possession of Defendants; (3) cybercriminals are selling large volumes of Private Information and corporate information on Dark Web portals; (4) the threats are increasing.

63.     Had each Defendant been diligent and responsible, it would have known about and acted upon warnings published in 2017 that 93% of data security breaches were avoidable and the key *avoidable* causes for security incidents are:

- Lack of complete assessment, including internal, third-party, and **cloud-based systems and services**;

- **Not promptly patching known/public vulnerabilities, and not having a way to process vulnerability reports**;

---

[42] https://www.law360.com/articles/1220974 (last visited September 5, 2024).

- Misconfigured devices/servers;

- **Unencrypted data and/or poor encryption key management and safeguarding;**

- Use of end-of-life (and thereby unsupported) devices, operating systems and applications;

- Employee errors and accidental disclosures — lost data, files, drives, devices, computers, improper disposal;

- Failure to block malicious email; and

- Users succumbing to business email compromise (BEC) and social exploits.[43]

64. Therefore, Defendants could have prevented this breach if they addressed the common avoidable causes for data breaches – including enabling and requiring the MFA features.

65. AT&T is aware the data it collects and stores about its customers is a high target for data thieves. This underscores the need for immediate injunctive and other relief to protect millions of consumers across the United States. Below is a timeline of AT&T data breaches:

**February 2024: AT&T Addresses Data Set Released on the Dark Web.** AT&T confirms that personal data belonging to 73 million customers was leaked on the Dark Web. The data may have included Social Security numbers, passcodes, full names, email addresses, mailing addresses, phone numbers, dates of birth, and AT&T account numbers. According to AT&T the data set appears to be from 2019 or earlier, impacting approximately 7.6 million current AT&T account holders and 65.4 million former account holders. AT&T states it has no evidence that the data theft was from unauthorized access to its systems.[44]

**March 2023: AT&T Notifies 9 Million Customers Following Attack on Vendor.** AT&T notified roughly 9 million customers that their data had been compromised following an attack on a third-

---

[43] https://www.proofpoint.com/us/securityawareness/post/ota-report-indicates-93-security-breaches-are-preventable (last visited September 5, 2024).

[44] https://www.att.com/support/article/my-account/000101995 (last visited September 5, 2024).

party vendor. AT&T described the exposed data as "Customer Proprietary Network Information," including data on customers' wireless plans and payment amounts.

**August 2022: Stolen Data Discovered on 23 Million AT&T Customers.** Hold Security – a cybersecurity firm – discovered stolen data featuring the names, Social Security numbers, dates of birth, and more information on approximately 23 million Americans. After analyzing the data Hold Security determined it likely relates to current or former AT&T customers. AT&T claimed this breach was potentially connected to a data incident at another company.

**July 2020: US Department of Justice Charges AT&T Employees in Massive Phone Unlocking Scheme.** Between 2012 and 2017, a number of AT&T employees at a call center in Bothell, Washington, were bribed to install malware and install unauthorized hardware as part of a phone unlock scam. Two men paid more than $1 million in bribes to compromise AT&T's internal networks and have phones unlocked in exchange for payments. It was estimated the hackers unlocked over 2 million devices.

**April 2014: Third-Party Vendor Uses Personal Data to Unlock Phones.** An AT&T wireless data breach relating to the activities of three third-party vendor employees. The employees accessed personal data on customer accounts without authorization, giving them the ability to view details like birth dates, Social Security numbers, and limited call data such as destination numbers, times and dates of calls, and durations. The employees were requesting codes to unlock AT&T mobile devices, making them usable on other networks. At least 500 customers were affected.

**2014: AT&T Insider Data Breach Exposes Information on 280k Customers.** In 2013 and 2014, employees at AT&T call centers operating in Colombia, Mexico, and the Philippines exposed sensitive customer data to third parties. The data included the names and Social Security numbers (either full or partial) of approximately 280,000 AT&T customers. In April 2015, the FCC fined AT&T $25 million for the breach.[45]

66.    In March 2023, the FTC sought comments from businesses across the economy (like AT&T) on the business practices of cloud computing providers including issues related to

---

[45] https://firewalltimes.com/att-data-breaches (last visited September 5, 2024).

the market power of these companies, impact on competition, and potential security risks.[46]

67.     The FTC acknowledged it had brought several cases against companies that failed to implement basic security safeguards to protect data they stored on third-party cloud computing services and that the FTC has issued guidance to businesses on steps they can take to secure and protect data stored in the cloud.[47]

68.     FTC guidance to companies like AT& for the use of cloud services includes the following six tips: (1) take advantage of the security features offered by cloud service companies; (2) take regular inventories of what you keep in the cloud; (3) do not store personal information when it is not necessary; (4) consider encrypting rarely used data; (5) pay attention to credible warning; (6) security is your responsibility.[48]

**G.     Plaintiff and the Class Have Suffered Injury as a Result of Defendants' Data Mismanagement**

69.     As a result of Defendants' failure to implement and follow even the most basic security procedures, Plaintiff's and Class Members' Private Information has been and is now in the hands of an unauthorized third-party that may include thieves, unknown criminals, and other potentially hostile individuals or entities. Plaintiff and Class Members now face an increased risk of identity theft and will consequentially have to spend, and will continue to spend, significant time and money to protect themselves due to the Data Breach.

70.     Although personally identifying information such as names were not (allegedly)

---

[46]     https://www.ftc.gov/news-events/news/press-releases/2023/03/ftc-seeks-comment-business-practices-cloud-computing-providers-could-impact-competition-data (last visited September 5, 2024).

[47]     *Id.*

[48]     https://www.ftc.gov/business-guidance/blog/2020/06/six-steps-toward-more-secure-cloud-computing (last visited September 5, 2024).

disclosed in the Data Breach, AT&T admits that "[w]hile the data doesn't include customer names, there are often ways to find a name associated with a phone number using publicly available online tools."[49]

71.     AT&T recognizes that Plaintiff and Class Members face an increased risk of phishing and smishing attacks, and other online fraud and online threats because of the Data Breach warning Plaintiff and Class Members:[50]

**What can I do to help protect myself from phishing, smishing, and other online fraud?**    ⌄

- Only open text messages from people that you know and trust.
- Don't reply to a text from an unknown sender with personal details.
- Go directly to a company's website. Don't use links included in a text message. Scammers can build fake websites using forged company logos, signatures, and styles.
- Make sure a website is secure by looking for the "s" after the http in the address. You can also look for a lock icon at the bottom of a webpage.

Find more tips and info on CyberAware, our website dedicated to raising awareness and educating customers on fraud and cyber threats.

**What can I do to help protect myself from online threats?**    ⌄

As a general rule, we recommend that you remain cautious of any phone call or text request asking you for personal, account, or credit card details. If you suspect:

- **Suspicious text activity:** Do not reply. Learn how to forward the text to AT&T so we can assist you. Forwarded messages are free and won't count toward your text plan.
- **You are a target of fraud on your AT&T wireless number:** Report it to our Fraud team. If you suspect fraud on another account, call the customer service number on your bill for help.

72.     Plaintiff and members of the Class must immediately devote time, energy, and money to: (1) closely monitor their bills, records, and credit and financial accounts; (2) change login and password information on any sensitive account; (3) more carefully screen and scrutinize phone calls, emails, and other communications to ensure that they are not being targeted in a social engineering or spear phishing attack; and (4) search for suitable identity theft protection and credit

---

[49]  https://www.att.com/support/article/my-account/000102979 (last visited September 5, 2024).

[50]  *Id.*

monitoring services, and pay to procure them.

73.     For instance, because this Data Breach, and AT&T's express warnings, Plaintiff Wallace must continue to devote time and energy to review all her financial activity and monitor her credit. She must continue to consistently change logins and password information on various personal accounts which could subject her to a monetary loss, scrutinizing and screening phone calls, emails, and other communications, and must continue to use identity theft protection and credit monitoring services.

74.     Plaintiff have also overpaid AT&T for its services, a portion of which was dedicated to protecting Plaintiff's Private Information and activities (such as call logs/text messages) while using AT&T's services.

75.     Once Private Information is exposed, there is virtually no way to ensure that the exposed information has been fully recovered or contained against future misuse. For this reason, Plaintiff and Class Members will need to maintain these heightened measures for years because of Defendants' conduct. Further, the value of Plaintiff's and Class Members' Private Information has been diminished by its exposure in the Data Breach.

76.     Plaintiff and members of the Class suffered actual injury from having Private Information compromised as a result of Defendants' negligent data management and resulting Data Breach including, but not limited to (a) damage to and diminution in the value of their Private Information, a form of property that Defendants obtained from and about Plaintiff and Class Members; (b) violation of their privacy rights; and (c) present and increased risk arising from the identity theft and fraud through phishing, smishing, and other hostile attacks.

77.     Because Defendants failed to implement and follow even the most basic security procedures, Plaintiff's and Class Members' Private Information has been and is now in the hands

of unauthorized third-party criminals. Plaintiff and Class Members now face an increased risk of identity theft and will consequentially have to spend, and will continue to spend, considerable time and money to protect themselves due to the Data Breach.

78.     Plaintiff and Class Members have had their Private Information stolen by cybercriminals and have experienced and will continue to experience emotional pain and mental anguish and embarrassment. The criminals now know Plaintiff and Class Members' detailed call log activities for 6 months – which depict who Plaintiff and Class Members interacted with and the associated metadata for those interactions, as well as location data for at least a subset of Class Members. This information can be used to perpetrate phishing scams, spoof phone numbers of the loved ones or corporate companies with whom Plaintiff and Class Members interact with to gain access to Plaintiff's and Class Members' financial resources. And this information consists of the information that cannot be changed, and is thus, of tremendous value to criminals.

79.     Plaintiff and Class Members face an increased risk of identity theft, phishing attacks, and related cybercrimes because of the Data Breach. Those impacted (including Plaintiff here) are under heightened and prolonged anxiety and fear, as they will be at risk of falling victim to cybercrimes for years to come.

80.     Furthermore, the information Defendants failed to protect here, can be aggregated and combined with the data from other data breaches (such as AT&T's earlier data breach). Thus, this key information regarding Plaintiff's and Class Members' detailed interaction for a prolonged period – six months – is even more valuable to thieves and more damaging to victims, which was not available to them before this Data Breach.

**H.     Defendants Failed to Comply with FTC Guidelines**

81.     Defendants are prohibited by the Federal Trade Commission Act (the "FTC Act"),

15 U.S.C. § 45, from engaging in "unfair or deceptive acts or practices in or affecting commerce." The Federal Trade Commission (the "FTC") has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of the FTC Act. *See, e.g.*, *FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236 (3d Cir. 2015).

82.     The FTC has promulgated numerous guides for businesses which show how important it is to implement reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.

83.     In 2016, the FTC updated its publication, Protecting Private Information: A Guide for Business, which established cyber-security guidelines for businesses. The guidelines note that businesses should protect the personal customer information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.[51] The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[52]

84.     The FTC further recommends that companies not maintain personal information longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented

---

[51]   https://www.ftc.gov/business-guidance/resources/protecting-personal-information-guide-business (last visited September 5, 2024)

[52]   *Id.*

reasonable security measures.

85.     The FTC has brought enforcement actions against businesses for failing to protect customer data reasonably and adequately, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the FTCA, 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

86.     And, as discussed above, the FTC has issued guidance specifically to the entities which use cloud-based services and reminded them that securing the information on the cloud-based services is their corporate responsibility.

## CLASS ACTION ALLEGATIONS

87.     Plaintiff brings this class action individually on behalf of herself and on behalf of all members of the below-defined nationwide class and state subclass (collectively, the "Classes") of similarly situated persons pursuant to Federal Rule of Civil Procedure 23. As described below, this action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of Rule 23(a) and 23(b)(3) (as well as the requirements for certification of one or more issue classes under Rule 23(c)(4)).

88.     Accordingly, Plaintiff seeks certification under Federal Rule of Civil Procedure 23 of the following Class and Subclass:

- **Nationwide Class:** All individuals residing in the United States and its territories whose Private Information was exposed, accessed, and/or acquired as a result of the Data Breach, including all who were sent a notice of the Data Breach.

- **Illinois Subclass:** All individuals residing in the State of Illinois whose Private Information was exposed, accessed and/or acquired as a result of the Data Breach, including all who were sent a notice of the Data Breach.

89.     Excluded from the Classes are (1) Defendants and their affiliates, parents, subsidiaries, officers, agents, and directors, any entity in which Defendants have a controlling interest; (2) all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; (3) those persons who have suffered personal injuries as a result of the facts alleged herein (4) any and all federal, state, or local governments, including, but not limited to, its departments, agencies, divisions, bureaus, boards, sections, groups, counsel, and/or subdivisions; and (5) all judges presiding over this matter or assigned to hear any aspect of this litigation, along with judicial clerks and staff, and immediate family members.

90.     Plaintiff reserves the right to modify or amend the foregoing Class and Subclass definitions before the Court determines whether certification is appropriate.

91.     This action has been brought and may properly be maintained as a class action under Federal Rule of Civil Procedure 23 because there is a well-defined community of interest in the litigation and membership in the proposed Classes is readily ascertainable.

92.     **Numerosity (Federal Rule of Civil Procedure 23(a)(1)):** A class action is the only available method for the fair and efficient adjudication of this controversy. The members of each Class are so numerous and geographically dispersed that individual joinder of all Class Members is neither practicable nor possible. Plaintiff is informed and believes and, on that basis, alleges that the number of Class Members is in the millions of individuals. Membership in the Class will be determined by analysis of Defendant's records.

93.     **Commonality (Federal Rule of Civil Procedure 23(a)(2) and (b)(3)):** Consistent with Rule 23(a)(2) and with Rule 23(b)(3)'s predominance requirement, Plaintiff and Class Members share a community of interest in that there are numerous common questions and issues

of law and fact which predominate over any questions and issues solely affecting individual members, including, but not necessarily limited to:

a.      Whether Defendants owed a duty to Plaintiff and Class Members to safeguard their Private Information;

b.      Whether Defendants owed a duty to provide timely and accurate notice of the Data Breach to Plaintiff and the Class Members;

c.      Whether Defendants unlawfully used, maintained, lost, or disclosed Plaintiff's and Class Members' Private Information;

d.      Whether Defendants were negligent in maintaining, protecting, and securing Private Information;

e.      Whether Defendants were negligent in failing to adequately monitor and audit the data security systems;

f.      Whether Defendants breached their duty to Plaintiff and Class Members to safeguard their Private Information;

g.      Whether Defendants failed to notify Plaintiff and Class Members as soon as practicable and without delay after the data breach was discovered;

h.      Whether Defendants failed to take reasonable and prudent security measures;

i.      Whether Defendants adequately addressed and fixed the vulnerabilities which permitted the Data Breach to occur;

j.      Whether Defendants' security measures to protect its systems were reasonable in light of known legal requirements;

k.      Whether Defendants' data security systems prior to and during the Data Breach were consistent with industry standards;

l.      Whether Defendants violated state consumer protection and state information privacy laws in connection with the actions described herein;

m.      Whether Defendants violated federal statutes including, but not limited to, FTCA;

n.      Whether Defendants engaged in unfair, unlawful, or deceptive practices by failing to safeguard Plaintiff's and Class Members' Private Information;

o.      Whether Defendants knew or should have known that their data security systems and monitoring processes were deficient;

p.      Which security procedures and notification procedures Defendants should be required to implement;

q.      Whether Defendants were unjustly enriched by unlawfully retaining benefits conferred upon them by Plaintiff and Class Members;

r.      Whether Defendants' conduct, including their alleged failure to act, resulted in or was the proximate cause of the Data Breach and/or loss of Private Information of Plaintiff and Class Members;

s.      Whether Plaintiff and Class Members were injured and suffered damages or other losses because of Defendant's failure to reasonably protect their Private Information; and

t.      Whether Plaintiff and Class Members are entitled to damages, civil penalties, punitive damages, treble damages, and/or injunctive relief.

94.      In the alternative, Plaintiff seeks certification under Rule 23(c)(4) with respect to one or more of the above issues or such other issues as may be identified in the future.

95.     **Typicality (Federal Rule of Civil Procedure 23(a)(3)):** Plaintiff's claims are typical of the claims of the Classes. Plaintiff's and Class Members' Private Information was in Defendant's possession at the time of the Data Breach and was compromised as a result of the Data Breach. Plaintiff sustained damages, akin to damages sustained by Class Members, arising out of and caused by Defendant's common course of conduct in violation of laws and standards, as alleged herein.

96.     **Adequacy (Federal Rule of Civil Procedure 23(a)(4)):** Consistent with Rule 23(a)(4), Plaintiff is an adequate representative of each of the Classes because Plaintiff is a member of the Classes and is committed to pursuing this matter against Defendants to obtain relief for the Classes. Plaintiff is not subject to any individual defense unique from those conceivably applicable to other Class Members or the Classes in their entirety. Plaintiff anticipates no difficulties in the management of this litigation. Plaintiff has no conflicts of interest with the Classes. Plaintiff's Counsel is competent and experienced in litigating class actions, including extensive experience in data breach and privacy litigation. Plaintiff intends to vigorously prosecute this case and will fairly and adequately protect the Classes' interests.

97.     **Predominance and Superiority (Federal Rule of Civil Procedure 23(b)(3)):** Consistent with Rule 23(b)(3), a class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. Common issues in this litigation predominate over individual issues. The issues discussed above in regard to commonality are more important to the resolution of this litigation than any individual issues. The purpose of the class action mechanism is to permit litigation against wrongdoers even when damages to individual plaintiffs may be insufficient to justify individual litigation. Here, the damages suffered by Plaintiff and the

Class Members are relatively minor compared to the burden and expense required to individually litigate their claims against Defendant, and thus, individual litigation to redress Defendant's wrongful conduct would be impracticable. Individual litigation by each Class Member would also burden and unreasonably strain the court system, and would result in undue delay. Individual litigation creates the potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economies of scale, and comprehensive supervision by a single court.

98.     **Ascertainability:** The Classes are defined by reference to objective criteria, and there is an administratively feasible mechanism to determine who fits within the class. Defendants have access to names in combination with addresses and/or email addresses of Class Members affected by the Data Breach.

99.     **Injunctive and Declaratory Relief:** This class action is also appropriate for certification because Defendants have acted or refused to act on grounds generally applicable to Class Members, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members and making final injunctive relief appropriate concerning the Classes in their entireties. Defendant's policies and practices challenged herein apply to and affect Class Members uniformly. Plaintiff's challenge of these policies and procedures hinges on Defendant's conduct concerning the Classes in their entirety, not on facts or law applicable only to Plaintiff. Unless a Class-wide injunction is issued, Defendants may continue failing to properly secure Class Members' Private Information, and Defendants may continue to act unlawfully, as set forth in this Complaint. Defendants have also acted or refused to act on

grounds generally applicable to the Classes and therefore final injunctive or corresponding declaratory relief for the Class Members as a whole is appropriate under Rule 23(b)(2).

<u>**CLAIMS BROUGHT ON BEHALF OF THE NATIONWIDE CLASS**</u>

<u>**COUNT ONE**</u>
**Negligence**

100. Plaintiff restates, re-alleges, and incorporates by reference each and every allegation of the preceding paragraphs of this Complaint as though fully set forth herein.

101. Defendants gathered and stored the Private Information of Plaintiff and Class Members as part of their business, which affects commerce.

102. The Private Information of Plaintiff and Class Members was entrusted to Defendants with the understanding that the information would be safeguarded.

103. Defendants knew about the sensitivity of the Private Information and the types of harm that Plaintiff and Class Members could and would suffer if their Private Information were wrongfully disclosed.

104. It was reasonably foreseeable to Defendants that Plaintiff and the Class Members would suffer such harm in the event of a cyber-attack such as the Data Breach here.

105. Defendants owed a duty to Plaintiff and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting Private Information in Defendants' possession from being compromised, lost, stolen, accessed, or misused by unauthorized persons.

106. Defendants owed a duty to Plaintiff and Class Members to provide reasonable security, consistent with industry standards and requirements, and to ensure that their computer systems, networks, and protocols, and the personnel responsible for them, adequately protected Plaintiff's and Class Members' Private Information.

107. Defendants also had a special relationship with Plaintiff and each of the Class Members. That special relationship arose because Defendants were entrusted with their confidential Private Information as a necessary part of the services rendered or goods sold by Defendants. That special relationship provides another basis on which Defendants owed a duty to Plaintiff and each of the Class Members to protect against unauthorized access to, theft of, and/or disclosure of their Private Information.

108. Defendants owed a duty to Plaintiff and Class Members to design, maintain, and test their computer systems, servers, and networks to ensure that all Private Information in their possession or control was adequately secured and protected.

109. Defendants owed a duty to Plaintiff and Class Members to create and implement reasonable data security practices and procedures to protect all Private Information in their possession or control, including not sharing information with other entities who maintain sub-standard data security systems.

110. Defendants owed a duty to Plaintiff and Class Members to implement and maintain processes that would immediately detect a breach of their data security systems promptly.

111. Defendants owed a duty to Plaintiff and Class Members to act on data security warnings and alerts promptly.

112. Defendants owed a duty to Plaintiff and Class Members to disclose in timely fashion if their computer systems and data security practices were inadequate in any way to safeguard individuals' Private Information, including from theft, because such an inadequacy would be a material fact in the decision to entrust Private Information to Defendants.

113.    Defendants owed a duty to Plaintiff and Class Members to encrypt and/or more reliably encrypt Plaintiff's and Class Members' Private Information, including using standard security measures, such as multifactor authentication.

114.    Defendants owed a duty to Plaintiff and Class Members to monitor user behavior and activity to identify possible threats to the confidentiality and integrity of Private Information.

115.    Defendants owed a duty to Plaintiff and Class Members to notify Plaintiff and Class Members of the Data Breach promptly and adequately, but failed to do so.

116.    Defendants had and continues to have duties to adequately disclose that Plaintiff's and Class Members' Private Information within their possession was compromised, how it was compromised, and precisely the types of data that were compromised and when. Such notice was and remains necessary to allow Plaintiff and the Class Members to prevent, mitigate, and repair any identity theft and the fraudulent use of their Private Information by third parties.

117.    Plaintiff and the Class Members were the foreseeable and probable victims of any inadequate security practices and procedures. Defendants knew or should have known of the inherent risks in creating, collecting, and storing Private Information, the critical importance of providing adequate security of that Private Information, and the necessity for encrypting Private Information stored on their systems.

118.    Plaintiff and the Class Members had no ability to protect their Private Information that was in, and possibly remains in, Defendants' possession.

119.    Defendants were in a position to protect against the harm suffered by Plaintiff and the Class Members as a result of the Data Breach.

120.    Defendants' duties extended to protecting Plaintiff and the Class Members from the risk of foreseeable criminal conduct of third parties, which have been recognized in situations

where the actor's own conduct or misconduct exposes another to the risk or defeats protections put in place to guard against the risk, or where the parties are in a special relationship. *See* Restatement (Second) of Torts § 302B. Numerous courts and legislatures have also recognized the existence of a specific duty to reasonably safeguard personal information.

121. Defendants failed to perform their duties by failing to secure their systems reasonably and adequately (and the Private Information of Plaintiff and the Class Members) against the Data Breach.

122. But for Defendants' wrongful and negligent breaches of duties owed to Plaintiff and the Class Members, Plaintiff's and Class Members' Private Information would not have been exposed to the Data Breach and compromised.

123. There is a close causal connection between Defendants' failure to implement security measures to protect Plaintiff's and Class Members' Private Information, and the harm, or risk of imminent harm, suffered by Plaintiff and the Class Members.

124. As a direct and proximate result of Defendants' negligence, Plaintiff and the Class Members have suffered and will suffer injury to their privacy, the value of their Private Information, and other forms of injury and/or harm, including, but not limited to, emotional distress, loss of privacy, anxiety, annoyance, nuisance, and other economic and non-economic losses including nominal damages.

125. Plaintiff and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

126. Defendants' negligent conduct is ongoing, in that Plaintiff's and Class Members' Private Information is being maintained in an unsafe and insecure manner.

127.    Plaintiff and Class Members are entitled to injunctive relief requiring Defendants to: (a) strengthen its data security systems and monitoring procedures; (b) submit to future annual audits of those systems and monitoring procedures; and (c) continue to provide adequate credit monitoring to Plaintiff and all Class Members.

## COUNT TWO
### Negligence Per Se

128.    Plaintiff restates, re-alleges, and incorporates by reference each and every allegation of the preceding paragraphs of this Complaint as though fully set forth herein.

129.    Defendants owed a duty to Plaintiff and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting their Private Information in its possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons.  More specifically, this duty included, among other things: (a) designing, maintaining, and testing security systems to ensure that Plaintiff and Class Members' Private Information in Defendants' possession was adequately secured and protected; (b) implemented processes that would prevent or detect a breach of its security system in a timely manner; (c) timely acting upon warnings and alerts including those generated by its own security personnel or systems, regarding intrusions to its networks; and (d) maintaining data security measure consistent with industry standards.

130.    Defendants knew that the Private Information of Plaintiff and the Class was personal and sensitive information that was valuable to identity thieves and other criminals. Defendants also knew of the serious harm that could happen if the Private Information of Plaintiff and the Class was wrongfully disclosed, that disclosure was not fixed, or if Plaintiff and the Class were not told about the disclosure in a timely manner.

131.    Defendants owed duties arising under the FTCA, and state data security and consumer protection statutes such as those outlined herein to protect Plaintiff's and Class Members' Private Information. Section 5 of the FTCA prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by companies such as Defendants for failing to use reasonable measures to protect Private Information. Various FTC publications and orders also form the basis for Defendants' duty.

132.    On information and belief, Defendants breached their duties and thus violated Section 5 of the FTCA and other applicable standards by failing to use reasonable data security measures to protect Private Information.  Defendants' conduct was particularly unreasonable given the nature and amount of user data it obtains and stores, and the foreseeable consequences of a data breach within the technology industry.,

133.    Defendants' violation of the FTCA, and similar state statutes constitutes negligence per se.

134.    Plaintiff and Class Members are consumers within the class of persons that the FTCA was intended to protect.

135.    The harm that has occurred is the type of harm the FTCA was intended to guard against.

136.    The FTC has pursued enforcement actions against businesses that, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiff and the Class Members.

137.    Plaintiff and Class Members were foreseeable victims of Defendants' violations of the FTCA, as well as state data security and consumer protection statutes. Defendants knew or should have known that their failure to implement reasonable data security measures to protect

and safeguard Plaintiff's and Class Members' Private Information would cause damage to Plaintiff and the Class Members.

138.    But for Defendants' wrongful and negligent breaches of duties owed to Plaintiff and the Class Members, Plaintiff's and Class Members' Private Information would not have been exposed to the Data Breach and potentially compromised.

139.    There is a close causal connection between Defendants' failure to implement security measures to protect Plaintiff's and Class Members' Private Information, and the harm, or risk of imminent harm, suffered by Plaintiff and the Class Members.

140.    As a direct and proximate result of Defendants' negligence, Plaintiff and the Class Members have suffered and will suffer injury to their privacy, the value of their Private Information, and other forms of injury and/or harm, including, but not limited to, emotional distress, loss of privacy, anxiety, annoyance, nuisance, and other economic and non-economic losses including nominal damages.

141.    Plaintiff and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

142.    Defendants' negligent conduct is ongoing, in that Plaintiff's and Class Members' Private Information is being maintained in an unsafe and insecure manner.

143.    Plaintiff and Class Members are entitled to injunctive relief requiring Defendants to: (a) strengthen their data security systems and monitoring procedures; (b) submit to future annual audits of those systems and monitoring procedures; and (c) continue to provide adequate credit monitoring to Plaintiff and all Class Members.

## COUNT THREE
### Negligent Failure to Warn

144. Plaintiff restates, re-alleges, and incorporates by reference each and every allegation of the preceding paragraphs of this Complaint as though fully set forth herein.

145. Upon information and belief, Defendants were or should have been aware for a substantial period that their cybersecurity systems and networks were inadequate and prone to attack.

146. Upon information and belief, Defendants knew or should have known of their cybersecurity failures including, but not limited to, failing to heed credible security warnings; failing to maintain adequate patch management policies and procedures; failing to detect alerts in regard to vulnerabilities affecting its systems; failing to properly update and patch third-party software, update software regularly, implement third-party patches when issued, and prioritize patches by the severity of the threat; failing to properly use automated tools to track which versions of software were running and whether updates were available; and failing to implement appropriate procedures to keep security current and address vulnerabilities, including to monitor expert websites and software vendors' websites regularly for alerts about new vulnerabilities.

147. Nevertheless, Defendants failed to warn Plaintiff and Class Members of the known cybersecurity vulnerabilities, failed to effectively remedy the cybersecurity flaws and problems in their systems and networks, failed to warn Plaintiff and Class Members of likely risks caused by Defendants' failure to remedy such cybersecurity flaws, and failed to provide prompt notice to Plaintiff and Class Members that the secure information systems had been breached by unauthorized persons during the Cyberattack.

148. As a direct and proximate result of Defendants' negligent failure to warn, Plaintiff and the Class Members have suffered and will suffer injury.

## COUNT FOUR
## Breach of Implied Contract

149.    Plaintiff restates, re-alleges, and incorporates by reference each and every allegation of the preceding paragraphs of this Complaint as though fully set forth herein.

150.    Plaintiff and Class Members were required to deliver their Private Information to AT&T as part of obtaining products and/or services from AT&T. Plaintiff and Class Members paid money, or money was paid on their behalf, to AT&T in exchange for said products and/or services.

151.    AT&T solicited, offered, and invited Class Members to provide their Private Information as part of Defendant's regular business practices. Plaintiff and Class Members accepted Defendant's offers and provided their Private Information to Defendant.

152.    AT&T accepted possession of Plaintiff's and Class Members' Private Information for the purpose of providing services or products to Plaintiff and Class Members.

153.    Plaintiff and the Class entrusted their Private Information to Defendant. In so doing, Plaintiff and the Class Members entered into implied contracts with AT&T by which AT&T agreed to safeguard and protect such information, to keep such information secure and confidential, and to timely and accurately notify Plaintiff and the Class Members if their data had been breached and compromised or stolen.

154.    In entering such implied contracts, Plaintiff and Class Members reasonably believed and expected that Defendant's data security practices complied with relevant laws and regulations and were consistent with industry standards.

155.    Implicit in the agreement between Plaintiff and Class Members and AT&T to provide Private Information, was the latter's obligation to: (a) use such Private Information only for business purposes; (b) take reasonable steps to safeguard the Private Information; (c) prevent

unauthorized disclosures of the Private Information; (d) provide Plaintiff and Class Members with prompt and sufficient notice of any and all unauthorized access and/or theft of their Private Information; (e) reasonably safeguard and protect the Private Information of Plaintiff and Class Members from unauthorized disclosure or uses, (f) retain the Private Information only under conditions that kept such information secure and confidential.

156.    The mutual understanding and intent of Plaintiff and Class Members on the one hand, and Defendant, on the other, is demonstrated by their conduct and course of dealing.

157.    AT&T breached its contractual obligations regarding the protection of Plaintiff's and Class Members' Private Information, as described in detail herein.

158.    AT&T knew that if it were to breach the implied contract with its customers, Plaintiff and Class Members would be harmed.

159.    As a direct and proximate result of Defendant's breach of contract, Plaintiff and the Class Members have suffered and/or will suffer injury.

## COUNT FIVE
### Unjust Enrichment

160.    Plaintiff restates, re-alleges, and incorporates by reference each and every allegation of the preceding paragraphs of this Complaint as though fully set forth herein.

161.    This claim is pleaded in the alternative to the breach of implied contract claim above.

162.    Plaintiff and Class Members conferred a monetary benefit on Defendants in connection with obtaining its products and services, specifically providing Defendants directly or indirectly with their Private Information. In exchange, Plaintiff and Class Members should have received from Defendants services or products that were the subject of the transaction and should have had their Private Information protected with adequate data security.

163. Defendants knew that Plaintiff and Class Members conferred a benefit upon them and accepted and retained that benefit by accepting and retaining the Private Information entrusted to them. Defendants profited from Plaintiff's and Class members' retained data and the use of Plaintiff's and Class Members' Private Information for business purposes.

164. Defendants failed to act and update their systems to secure Plaintiff's and Class Members' Private Information and, therefore, did not fully compensate Plaintiff or Class Members for the value that their Private Information provided.

165. Defendants acquired Plaintiff's and Class Members' Private Information through inequitable record retention as they failed to disclose the inadequate data security practices alleged.

166. Had Plaintiff and Class Members known that Defendants would not use adequate data security practices, procedures, and protocols to adequately monitor, supervise, and secure their Private Information, or vendors that house their Private Information, they would not have entrusted their Private Information to Defendant.

167. Under the circumstances, it would be unjust for Defendants to be permitted to retain any of the benefits that Plaintiff and Class Members conferred upon it.

168. As a direct and proximate result of Defendant's conduct, Plaintiff and the Class Members have suffered and will suffer injury.

169. Plaintiff and Class Members are entitled to restitution and/or damages from Defendants and/or an order proportionally disgorging all profits, benefits, and other compensation obtained by Defendants as a result of its wrongful conduct, as well as the return of their sensitive Private Information and/or confirmation that it is secure. This can be accomplished by establishing a constructive trust from which Plaintiff and Class Members may seek restitution or compensation.

170.    Plaintiff and Class Members may not have an adequate remedy at law against Defendants and, accordingly, plead this count in addition or as an alternative to the other counts plead herein.

## COUNT SIX
### Declaratory Judgment

171.    Plaintiff restates, re-alleges, and incorporates by reference each and every allegation of the preceding paragraphs of this Complaint as though fully set forth herein.

172.    Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, et seq., this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and to grant further necessary relief. Furthermore, the Court has broad authority to restrain acts, such as those here, that are tortious and violate the terms of the federal and state statutes described in this Complaint.

173.    An actual controversy has arisen in the wake of the Data Breach regarding Plaintiff's and Class Members' Private Information and whether Defendants are currently maintaining data security measures adequate to protect Plaintiff and Class Members from further data breaches that compromise their Private Information. Plaintiff alleges that Defendant's data security measures remain inadequate. In addition, Plaintiff continues to suffer injuries as result of the exposure of her Private Information and remains at imminent risk that further compromises of her Private Information will reoccur.

174.    Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

a.    Defendants owe a legal duty to secure Plaintiff's and Class Members' Private Information, select vendors who handle Private Information that will adequately safeguard that information, and to timely and adequately notify impacted individuals of a data breach, and

b.     Defendants continue to breach this legal duty by failing to employ reasonable measures to secure Private Information in its possession.

173.     Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment awarding Plaintiff and the Classes equitable, injunctive, and declaratory relief as may be appropriate to protect the interests of Plaintiff and Class Members, including, but not limited to, an Order:

a.     Declaring that Defendants owe a legal duty to secure Plaintiff and Class Members' Private Information pursuant to their common law duties, Section 5 of the FTCA, and various state statutes;

b.     Enjoining Defendants from engaging in the wrongful and unlawful conduct complained of herein pertaining to the misuse, failure to protect, and/or disclosure of Plaintiff's and Class Members' Private Information;

c.     Requiring Defendants to implement appropriate security protocols designed to protect the confidentiality and integrity of Private Information, including through:

i.     utilization of appropriate methods, procedures, and policies with respect to collection, storage, and use of Private Information;

ii.     encryption of all data collected through the course of business in accordance with applicable regulations, industry standards, and federal, state, and local laws;

iii.     monitoring of ingress and egress of all network traffic;

iv.     engaging independent third-party auditors and internal personnel to run automated security monitoring, simulated attached, penetration tests, and audits on Defendant's systems;

> v.     segmenting of data by creation of appropriate firewalls and access controls; and
>
> vi.     establishing an appropriate and/or supplementing their existing information security training programs;

d.     Compelling Defendants to issue prompt, complete, specific, and accurate disclosures to Plaintiff and Class Members, with respect to all Private Information compromised as the result of the Data Breach;

e.     Requiring Defendants to meaningfully educate all Class Members about the threats they face as a result of the loss of their Private Information to third parties, as well as the steps affected individuals must take to protect themselves;

f.     Compelling Defendants to facilitate, maintain, and/or pay for credit monitoring services for Plaintiff and the Classes, for a period not less than five years;

g.     Requiring Defendants to implement, maintain, regularly review, and revise as necessary a threat management program designed to appropriately monitor Defendant's information networks for threats, both internal and external, and assess whether monitoring tools are appropriately configured, tested, and updated; and

h.     Appointing a qualified and independent third-party assessor to conduct an attestation on an annual basis, for a period of ten years, to evaluate Defendant's compliance with the terms of the Court's final judgments, to provide such report to the Court and counsel for the Class, and to report any deficiencies with compliance with the Court's judgment.

174.     If an injunction is not issued, Plaintiff and Class Members will suffer irreparable injury, and lack an adequate legal remedy, in the event of another data breach at, or implicating, Defendant. The risk of another such breach is real, immediate, and substantial. If another breach

occurs, Plaintiff and Class Members will not have an adequate remedy at law because many of the resulting injuries are not readily quantified and they will be forced to bring multiple lawsuits to rectify the same conduct.

175.    The hardship to Plaintiff and Class Members if an injunction is not issued exceeds the hardship to Defendants if an injunction is issued. Plaintiff and Class Members are subject to an imminent likelihood of substantial identity theft and other damage. On the other hand, the cost to Defendants of complying with an injunction by employing reasonable prospective data security measures is relatively minimal, and Defendants have a pre-existing legal obligation to employ such measures.

176.    Issuance of the requested injunction will not disserve the public interest. In contrast, such an injunction would benefit the public by preventing another data breach at or by Defendant, thus eliminating the additional injuries that would result to Plaintiff and Class Members whose confidential information would be further compromised.

## CLAIMS BROUGHT ON BEHALF OF THE ILLINOIS SUBCLASS

### COUNT SEVEN
### Illinois Personal Information Protection Act
### 815 Ill. Comp. Stat. §§ 530/10(a), *et seq.*

177.    Plaintiff restates, re-alleges, and incorporates by reference each and every allegation of the preceding paragraphs of this Complaint as though fully set forth herein.

178.    As a publicly held corporation which handles, collects, disseminates, and otherwise deals with nonpublic personal information ("PII"), Defendants are each a Data Collector as defined in 815 Ill. Comp. Stat. § 530/5.

179.    Defendants are Data Collectors that own or license computerized data that includes PII. Defendants also maintain computerized data that includes PII, which Defendants do not own.

180.    Plaintiff's and Illinois Subclass Members' PII includes "personal information" as defined by 815 Ill. Comp. Stat. § 530/5.

181.    Defendants are required to give immediate notice of a breach of a security system to owners of PII which Defendants do not own or license, including Plaintiff and Illinois Subclass Members, pursuant to 815 Ill. Comp. Stat. § 530/10(b).

182.    By failing to give immediate notice to Plaintiff, Defendants violated 815 Ill. Comp. Stat. § 530/10(b).

183.    Defendants are required to notify Plaintiff and Illinois Subclass Members of a breach of its data security system which may have compromised PII which Defendants owns or licenses in the most expedient time possible and without unreasonable delay pursuant to 815 Ill. Comp. Stat. § 530/10(a).

184.    By failing to disclose the Data Breach to Plaintiff and Illinois Subclass Members in the most expedient time possible and without unreasonable delay, Defendants violated 815 Ill. Comp. Stat. § 530/10(a).

185.    Pursuant to 815 Ill. Comp. Stat. § 530/20, a violation of 815 Ill. Comp. Stat. § 530/10(a) constitutes an unlawful practice under the Illinois Consumer Fraud and Deceptive Business Practices Act.

186.    As a direct and proximate result of Defendants' violations of 815 Ill. Comp. Stat. § 530/10(a), Plaintiff and Illinois Subclass Members suffered damages, as described above.

187.    Plaintiff and Illinois Subclass Members seek relief under 815 Ill. Comp. Stat. § 510/3 for the harm they suffered because of Defendants' willful violations of 815 Ill. Comp. Stat. § 530/10(a), including equitable relief, costs, and attorneys' fees.

## COUNT EIGHT
### Illinois Consumer Fraud and Deceptive Business Practices Act
### 815 Ill. Comp. Stat. §§ 505, *et seq.*

188.    Plaintiff restates, re-alleges, and incorporates by reference each and every allegation of the preceding paragraphs of this Complaint as though fully set forth herein.

189.    Defendants are each a "person" as defined by 815 Ill. Comp. Stat. §§ 505/1(c).

190.    Plaintiff and Illinois Subclass Members are "consumers" as defined by 815 Ill. Comp. Stat. §§ 505/1(e), and Defendants' conduct as described herein was in the conduct of "trade" or "commerce" as defined by 815 Ill. Comp. Stat. § 505/1(f).

191.    In the course of their business, Defendants engaged in deceptive, unfair, and unlawful trade acts or practices in violation of the Illinois Consumer Fraud and Deceptive Business Practices Act.

192.    Specifically, by failing to implement reasonable security measures to protect Plaintiff's and Illinois Subclass Members' PII, and misrepresenting, concealing, and omitting material facts regarding the adequacy of its data security measures, Defendants engaged in unfair and deceptive acts and practices pursuant to 815 Ill. Comp. Stat. § 505/2, including the following conduct expressly declared unlawful by 815 Ill. Comp. Stat. §§ 510/2(a)(5), (7), (9), and (12):

a.    Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have;

b.    Representing that goods or services are of a particular standard, quality, or grade or that goods are a particular style or model, if they are of another;

c.    Advertising goods or services with intent not to sell them as advertised; and

d.    Engaging in any other conduct which similarly creates a likelihood of confusion or misunderstanding.

193. In addition, Defendants' failure to implement and maintain reasonable security measures to protect Plaintiff's and Illinois Subclass Members' PII in violation of 815 Ill. Comp. Stat. § 530/10(a) constitutes an unlawful practice pursuant to 815 Ill. Comp. Stat. § 530/20.

194. The above unfair and deceptive acts and practices by Defendants were immoral, unethical, oppressive, and unscrupulous. These acts caused substantial injury that these consumers could not reasonably avoid; this substantial injury outweighed any benefits to consumers or to competition.

195. Plaintiff and Illinois Subclass Members reasonably relied on Defendants' knowing and intentional material misrepresentations and omissions regarding the adequacy of their data security and ability to protect the confidentiality of consumers' PII to their detriment, as detailed above.

196. As a direct and proximate result of Defendants' unfair, unlawful, and deceptive acts and practices, Plaintiff and Illinois Subclass Members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including losses from fraud and identity theft; costs for credit monitoring and identity protection services; time and expenses related to monitoring their financial accounts for fraudulent activity; loss of value of their Private Information; and an increased, imminent risk of fraud and identity theft.

197. Plaintiff and Illinois Subclass Members seek all monetary and non-monetary relief allowed by law, including damages, restitution, punitive damages, injunctive relief, and reasonable attorneys' fees and costs.

## COUNT NINE
### Illinois Uniform Deceptive Trade Practices Act
### 815 Ill. Comp. Stat. §§ 510/1, *et seq.*

198.    Plaintiff restates, re-alleges, and incorporates by reference each and every allegation of the preceding paragraphs of this Complaint as though fully set forth herein.

199.    Defendants are each a "person" as defined by 815 Ill. Comp. Stat. §§ 510/1(5).

200.    Defendants engaged in deceptive trade practices in the conduct of their business, in violation of the Illinois Uniform Deceptive Trade Practices Act.

201.    Specifically, by failing to meet duties to implement adequate measures to protect Plaintiff's and Illinois Subclass Members' PII, and misrepresenting, concealing, and omitting material facts regarding the adequacy of its data security measures, Defendants engaged in deceptive and unfair acts under 815 Ill. Comp. Stat. § 510/2(a), including the following conduct expressly declared unlawful under 815 Ill. Comp. Stat. §§ 510/2(a)(5), (7), (7), and (12):

a.      Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have;

b.      Representing that goods or services are of a particular standard, quality, or grade or that goods are a particular style or model, if they are of another;

c.      Advertising goods or services with intent not to sell them as advertised; and

d.      Engaging in any other conduct which similarly creates a likelihood of confusion or misunderstanding.

202.    Plaintiff and Illinois Subclass Members reasonably relied on Defendants' knowing and intentional material misrepresentations and omissions regarding the adequacy of Defendants' data security and ability to protect the confidentiality of consumers' PII to their detriment, as detailed above.

203.     The above unfair and deceptive acts and practices by Defendants were immoral, unethical, oppressive, and unscrupulous. These acts caused substantial injury to Plaintiff and Illinois Subclass Members that they could not reasonably avoid; this substantial injury outweighed any benefits to consumers or to competition.

204.     As a direct and proximate result of Defendants' unfair, unlawful, and deceptive trade practices, Plaintiff and Illinois Subclass Members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including losses from fraud and identity theft; costs for credit monitoring and identity protection services; time and expenses related to monitoring their financial accounts for fraudulent activity; loss of value of their Private Information; and an increased, imminent risk of fraud and identity theft.

205.     Plaintiff and Illinois Subclass Members seek all relief allowed by law, including injunctive relief.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all other members of the proposed Class and Subclass, respectfully request that the Court enter judgment in Plaintiff's favor and against Defendants as follows:

A.     Declaring, adjudging, and decreeing that this action is a proper class action, and certifying each of the proposed Classes and/or any appropriate Subclass pursuant to Federal Rule of Civil Procedure 23(b)(1), (b)(2), and/or (b)(3), including designating Plaintiff as Class representative and appointing Plaintiff's counsel as Class Counsel;

B.     Awarding Plaintiff and the Class and Subclass appropriate monetary relief, including actual damages; statutory damages; consequential damages; punitive damages;

exemplary damages; nominal damages; restitution; and disgorgement of all earnings, interest, profits, compensation, and benefits received as a result of their unlawful acts, omissions, and practices;

C.     Awarding Plaintiff and the Classes equitable, injunctive, and declaratory relief as may be appropriate to protect the interests of Plaintiff and Class Members, including, but not limited to, an Order:

1.     enjoining Defendants from engaging in the wrongful and unlawful conduct complained of herein pertaining to the misuse, failure to protect, and/or disclosure of Plaintiff's and Class Members' Private Information;

2.     requiring Defendants to implement appropriate security protocols designed to protect the confidentiality and integrity of Private Information, including through:

a.     utilization of appropriate methods, procedures, and policies with respect to collection, storage, and use of Private Information;

b.     encryption of all data collected through the course of business in accordance with applicable regulations, industry standards, and federal, state, and local laws;

c.     monitoring of ingress and egress of all network traffic;

d.     engaging independent third-party auditors and internal personnel to run automated security monitoring, simulated attached, penetration tests, and audits on Defendant's systems;

e.     segmenting of data by creation of appropriate firewalls and access controls; and

f.      establishing an appropriate and/or supplementing its existing information security training program;

3.      compelling Defendants to issue prompt, complete, specific, and accurate disclosures to Plaintiff and Class Members, with respect to the Private Information compromised as the result of the Data Breach;

4.      requiring Defendants to meaningfully educate Plaintiff and all Class Members about the threats they face as a result of the loss of their Private Information to third parties, as well as the steps affected individuals must take to protect themselves;

5.      compelling Defendants to facilitate, maintain, and/or pay for credit monitoring services for Plaintiff and the Classes, for a period not less than five years;

6.      requiring Defendants to implement, maintain, regularly review, and revise as necessary a threat management program designed to appropriately monitor Defendant's information networks for threats, both internal and external, and assess whether monitoring tools are appropriately configured, tested, and updated; and

7.      appointing a qualified and independent third-party assessor to conduct an attestation annually, for ten years, to evaluate Defendant's compliance with the terms of the Court's final judgments, to provide such report to the Court and counsel for the Class, and to report any deficiencies with compliance with the Court's judgment;

D.      Compelling Defendants to pay the costs associated with notification of Class Members about the judgment and administration of claims;

E.      Awarding Plaintiff and the Classes prejudgment and post-judgment interest to the maximum extent allowable;

F.   Awarding Plaintiff and the Classes reasonable attorneys' fees, costs, and expenses; and

G.   Awarding Plaintiff and the Classes such other favorable relief as allowable under law.

## JURY TRIAL DEMANDED

Plaintiff, individually and on behalf of the Class and/or Subclass, hereby demands a trial by jury of all issues in this Complaint so triable.

Dated: September 13, 2024                    Respectfully submitted,

_/s/ W. Mark Lanier_

W. Mark Lanier
**THE LANIER LAW FIRM, P.C.**
10940 W. Sam Houston Pkwy N. Ste. 100
Houston, Texas 77064
Tel: (713) 659-5200
Email: mark.lanier@lanierlawfirm.com

Shauna Itri
**SEEGER WEISS, LLP**
55 Challenger Road
Ridgefield Park, New Jersey 07660
Tel: (973) 639-9100
Email: sitri@seegerweiss.com

James E. Cecchi
**CARELLA BYRNE CECCHI
BRODY & AGNELLO, P.C.**
5 Becker Farm Road
Roseland, New Jersey 07068
Tel: (973) 994-1700
Email: jcecchi@carellabyrne.com

Sean S. Modjarrad
**MODJARRAD ABUSAAD & SAID**
212 W Spring Valley
Road Richardson, Texas 75081
Tel: (972) 789-1664
Email: smodjarrad@mas.law

Joseph P. Guglielmo
**SCOTT+SCOTT**
**ATTORNEYS AT LAW LLP**
230 Park Avenue, 17th Floor
New York, New York 10169
Tel: (212) 776-8259
Email: jguglielmo@scott-scott.com

Larry A. Golston, Jr.
**BEASLEY, ALLEN, CROW, METHVIN,**
**PORTIS & MILES, P.C.**
272 Commerce Street
Montgomery, Alabama 36104
Tel: (334) 269-2343
Email: larry.golston@beasleyallen.com

Rebecca L. Solomon
**TOUSLEY BRAIN STEPHENS PLLC**
1200 5th Ave, Ste 1700
Seattle, Washington 98101
Tel: (206) 682-5600
Email: rsolomon@tousley.com